**P. Y. DAMRON, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

May 29, 1958.

J. Gordon Lisanby, Princeton, for appellant.

Jo M. Ferguson, Atty. Gen., Wm. F. Simpson, Asst. Atty. Gen., for appellee.

MOREMEN, Chief Justice.

Appellant, P. Y. Damron, was convicted of maliciously striking and wounding Eugene Quertermous with a knife, a deadly weapon, with the intent to kill him, from which act death did not ensue—an offense denounced by subsection (2) of KRS 435.-170. He was sentenced to confinement in the penitentiary for three years.

On the night of August 4, 1956, a number of people had assembled at Conyer's Truck Stop where a dance or musical was in progress. Before the evening was over, incidents occurred which involved members of the Damron and Quertermous families, and others.

The evidence produced by the two factions is collisive, but the witnesses agree that Raymond Watson and Jimmie Damron, a 15 year old son of appellant, engaged in horseplay. Jimmie Damron was struck in the stomach, cried, and reported the matter to his parents. Watson went to where P. Y. Damron, Jimmie Damron and others were standing and told appellant that he and young Damron were only playing and he intended no harm. At that time Eugene Quertermous approached the the group.

From this point on, the testimony is sharply in contrast. Eugene Quertermous testified:

"I started back to my car and got to the back end of it and seen Raymond and P. Y. (Damron) standing there, and I said 'watch it P. Y.' and started on to the car, and he struck me on the arm, I threw my arm up and he hit me on the arm. He kept swinging and backed me clear to the gas pumps, about a hundred yards or more from where my car was at, and a boy ran in front of us and stopped us."

His version was supported by other witnesses.

Quertermous also stated that he did not know immediately that he had been wounded—he thought that his arm had been paralyzed by a blow—and had seen no knife or other instrument in Damron's hand. Upon discovery of the injury, he was taken to a doctor and later removed to a veterans' hospital. He has little use of his hand now.

According to appellant and witnesses introduced by him, there had been a previous encounter between them. Appellant testified:

"He ran off up in the crowd, several, and was standing back up there cursing me and calling me a God Damn son-of-a-bitch and all, and I said 'Now I will leave you alone,' and I started toward the car and walked three or four steps and met Raymond Watson and he commenced talking and said that 'we didn't mean anything; we were not mad' and I never said anything, and my wife hollered and said 'Duck Jim, he'll kill you.' The Quertermous boy had come out of the crowd at the back of me and the boy, and hit at him with a pair of knucks."

He also testified that it was his son Jimmie who hit at Quertermous with a knife but he qualified it by saying he did not see him do it. Jimmie, however, testified that upon being attacked, he drew his pocket knife and cut Quertermous. We must emphasize the fact that while the prosecution had no one who definitely said that he saw appellant use the knife, their version

of the happening was such that if their testimony is believed, no one but P. Y. Damron could have done the cutting. The testimony offered in behalf of the defense was to the effect that Damron did not injure Quertermous, but that his son did. Under this conflict of testimony we believe it clearly to be a question for the jury to decide.

Appellant contends, however, that the facts disclose that appellant acted in sudden heat and passion and without previous malice and, at most, should only have been found guilty under instruction No. 3 which submitted the question as to whether he had violated the provisions of KRS 435.180, a misdemeanor. It is appellant's contention that no malice was shown and, therefore, under the evidence, no conviction could properly be had under subsection (2) of KRS 435.170.

■ Malice in its legal sense means the intentional doing of a wrongful act towards another without legal justification or excuse. Roberson, 2nd Ed. Sec. 20. If the commonwealth's evidence is accepted as being true, appellant acted intentionally and cut Quertermous without legal excuse. Malice may be inferred from actions of the accused and from the manner in which the crime is committed.

■ It is urged that the court should have defined the phrases "deadly weapon" and "sudden affray." Subsection (2) of KRS 435.170, under which appellant was indicted, itself, classifies a knife as being a deadly weapon. That portion of the section reads "cuts, strikes or stabs another with a knife or other deadly weapon."

In Williams v. Commonwealth, 304 Ky. 359, 200 S.W.2d 926, it was held in a prosecution for cutting another with a knife that the failure of the court to define "deadly weapon" was not error. Likewise, it was stated in Edwards v. Commonwealth, 289 Ky. 318, 158 S.W.2d 377, that although it

was better practice to define the term "sudden affray" in the misdemeanor instruction, failure so to do has definitely been held not to be prejudicial error.

■ Appellant complains that the court permitted incompetent evidence to be introduced, first, because Quertermous was allowed to testify concerning the limited use of his hand because of the wound. We can find nothing objectionable in this. To cut another severely is indicative of an intention to kill, an element of the crime charged.

Next, appellant objected to these questions and answers:

"Q. Were you present when P. Y. stabbed at your brother Gene? Defendant objects. Overruled, if he did.

"Q. Did P. Y. Damron stab your brother Gene? A. I guess. Defendant objects. Overruled."

■ The first question was objected to because it assumed that appellant had stabbed the brother. It could have been in better form, but we do not find it prejudicial. In answer to the second question, the witness used a colloquialism to express the fact that he was not certain about the matter. We do not find it objectionable. Finally, in this connection, it is urged that the commonwealth should not have been permitted to show that appellant left the county after the grand jury met, and stayed away for almost a year, in view of the fact that he had sent word to the sheriff that he was leaving to earn money to employ a lawyer and that he voluntarily surrendered later. Evidence concerning flight—whatever may have been the motive—after an altercation such as we have here, is admissible to establish a presumption of guilt. Smith v. Commonwealth, 242 Ky. 399, 46 S.W.2d 513; Allen v. Commonwealth, 302 Ky. 546, 195 S.W.2d 96.

We believe the verdict was amply supported by the law and the evidence and the judgment is, therefore, affirmed.